

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 14, 2014**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| STEPHEN WAYNE KILLINGSWORTH | § | CASE NO. 08-32007-SGJ-7 |
| and SANDRA DENISE KILLINGSWORTH, | § | |
|     Debtors. | § | |

---

| | | |
|---|---|---|
| STEPHEN WAYNE KILLINGSWORTH, | § | |
|     Plaintiff, | § | |
| v. | § | Adversary No. 14-03043-SGJ |
| | § | |
| SANDRA C. DENMAN, | § | |
|     Defendant. | § | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT REGARDING DISCHARGEABILITY OF ALLEGED DEBT

The above-referenced adversary proceeding (the "Adversary Proceeding") involves a classic "he said; she said" dispute between a former Chapter 7 debtor, as plaintiff, and his former mother-in-law, as defendant. Sadly, what was once a family affair has now found itself into a

federal courthouse. In short, the former mother-in-law brought a suit in state court, against the former Chapter 7 debtor—years after he and her daughter received a discharge in bankruptcy and then, later, divorced. The mother-in-law's state court lawsuit seeks repayment of thousands of dollars of funds that the mother-in-law says she "loaned" to the son-in-law (or that he otherwise pilfered from her bank account) while he was still married to her daughter. The former Chapter 7 debtor does not dispute receipt of the funds, but argues that all monies received were in the nature of "gifts" to help support him and her oft-unemployed daughter during their marriage and, even if they should be characterized as loans, they were discharged during his and his former wife's Chapter 7 bankruptcy case. Notably, the former mother-in-law was not listed as a creditor or on the mailing list in the aforementioned Chapter 7 case (and she claims to have had no knowledge of this bankruptcy case, until after filing her state court lawsuit). In the midst of the state court lawsuit, the former Chapter 7 debtor moved to reopen his and his ex-wife's long-closed bankruptcy case, filed this Adversary Proceeding, and is now asking that this court: declare that his former mother-in-law is violating his bankruptcy discharge; enjoin further discharge violations by her; award damages; and grant further relief as just. The mother-in-law denies she is violating the discharge and asks this court to declare the non-dischargeability of her debt, pursuant to section 523(a)(3) of the Bankruptcy Code, and, as part of that process, not only find that the former Chapter 7 debtor has debt obligations to her, but also grant her a money judgment against him for the amounts allegedly owed.[1]

The court held a trial (the "Trial") in this Adversary Proceeding on October 20, 2014. The court hereby rules that the funds provided to the Chapter 7 debtor and his ex-wife prior to the April 30, 2008 bankruptcy petition date constituted ***gifts***, ***not loans*** and, thus, the request that

---

[1] "Family quarrels are bitter things. They don't go according to any rules. They're not like aches or wounds, they're more like splits in the skin that won't heal . . ."-F. Scott Fitgerald

this court declare that the former mother-in-law has a non-dischargeable debt, pursuant to section 523(a)(3), is denied.[2]   The following are the court's Findings of Fact, Conclusions of Law, and Judgment, pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings, pursuant to Federal Rule of Bankruptcy Procedure 7052.   Any Finding of Fact that more properly should be construed as a Conclusion of Law shall be considered as such, and *vice versa*.

## JURISDICTION AND VENUE

The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334, ***except as to disputes regarding the loans, gifts, or other transfers made after the April 30, 2008 Petition Date (as later explained in Finding of Fact No. 6 herein)***.   The court determines that this Adversary Proceeding involves primarily core matters, pursuant to 28 U.S.C. § 157(b)(2)(B) and (I), as the Adversary Proceeding involves primarily whether this court should enforce its prior discharge order and injunction, provided under section 524 of the Bankruptcy Code, and also the dischargeability of particular alleged debts.   Moreover, to the extent that other non-core claims are involved, this court finds that resolution of such claims is inextricably intertwined with resolution of the core matter of enforcement of the bankruptcy discharge injunction and determining dischargeability.   However, in the event of an appeal, should the district court determine that this court lacked Constitutional authority to enter final judgment on the non-bankruptcy law claims, this court asks the reviewing court to treat these findings of fact and conclusions of law as proposed findings of fact and conclusions of law (*i.e.,* a report and recommendation to the district court to be considered *de novo* by it), and to adopt, revise, or

---

[2] As later explained, the court will not exercise subject matter jurisdiction over the dispute as to funds provided to the former Chapter 7 debtor and his ex-wife ***after*** April 30, 2008.

reject it, as the district court may deem appropriate, with regard to the Plaintiff's non-bankruptcy law claims.[3]

## **FINDINGS OF FACTS**

1. Stephen Killingsworth, Plaintiff, and his ex-spouse Sandra Killingsworth filed a Chapter 7 bankruptcy case on April 30, 2008 (the "Petition Date"). The case was designated as a "no asset" case, since there were no nonexempt assets to distribute. Accordingly, no bar date for the filing of proofs of claim was ever set. The Killingsworths received a discharge by order (the "Discharge Order") entered July 30, 2008. For simplicity, Stephen Killingsworth will hereafter be sometimes referred to as the "Former Son-in-Law" or "Former Chapter 7 Debtor" and Sandra Killingsworth as the "Daughter" or sometimes "Ex-Wife."

2. The court takes judicial notice that the Killingsworths have filed two other bankruptcy cases in this District, besides the one just referenced. The first case was a chapter 7 case in the year 2000, Case # 00-32140, filed March 31, 2000, in which they received a discharge on July 31, 2000 ("Bankruptcy Case No. 1"). The second case was the above-referenced case, filed April 30, 2008, in which they received a discharge on July 30, 2008 ("Bankruptcy Case No. 2"). Finally, there was a third case, filed as a Chapter 13 rehabilitation case, Case # 10-33136, on May 3, 2010, which was dismissed just a few weeks later, on July 12, 2010, for the Killingsworths' failure to attend their Section 341 First Meeting of Creditors ("Bankruptcy Case No. 3").

3. Sandra Denman is the mother of Sandra Killingsworth and the ex-mother-in-law of Stephen Killingsworth. For simplicity, Sandra Denman will hereafter be sometimes referred to

---

[3] *See Exec. Benefits Ins. Agency v. Arkinson,* 134 S. Ct. 2165, 2173 (2014).

as the "Mother-in-Law." The Mother-in-Law is not unsophisticated—having worked in cash

management for a real estate company for 22 years, according to her testimony.

4. Prior to and after the Petition Date in Bankruptcy Case No. 2, significant sums of the

Mother-in-Law's money were transferred ("loaned"—according to the Mother-in-Law and

Daughter; "gifted"—according to the Former Son-in-Law) to the Former Son-in-Law. The

parties all stipulate that, from August 2007 through June 2012, exactly $30,529.81 of funds were

transferred, of which $17,358.70 was transferred before the Petition Date in Bankruptcy Case

No. 2.

5. The following summary table was presented by the parties,[4] setting out the stipulated

amounts transferred, manner of transfer, any funds returned, and remaining amounts that the

Mother-in-Law asserts as due:

| Date | Amount | Description |
|---|---|---|
| 8/3/2007 | $ 508.70 | Cell Phone bill - paid by phone |
| 8/7/2007 | $ 2,000.00 | Check #1001 |
| 8/23/2007 | $ 2,500.00 | Check #1009 |
| 9/28/2007 | $ 3,000.00 | Check #1031 |
| 11/20/2007 | $ 1,000.00 | Transfer - Acct. 1233800 |
| 12/20/2007 | $ 250.00 | Check #1076 |
| 3/21/2008 | $ 1,100.00 | Withdrawal - cash |
| 4/18/2008 | $ 1,000.00 | Withdrawal - cash |
| 4/11/2008 | $ 6,000.00 | Transfer - Acct. 1233800 |
| 6/11/2008 | $ 3,000.00 | Withdrawal - cash |
| 6/10/2008 | $ 496.11 | Check #1093 (groceries) |
| 8/12/2008 | $ 40.00 | Transfer - Acct. 1233800 |
| 8/22/2008 | $ 500.00 | Transfer - Acct. 1233800 |
| 7/7/2008 | $ 2,000.00 | Transfer - Acct. 1233800 |
| 12/23/2008 | $ 85.00 | Transfer - Acct. 1233800 |
| 4/3/2009 | $ (200.00) | Transfer - Acct. 1233800 (credit) |
| 8/18/2009 | $ 100.00 | Transfer - Acct. 1233800 |
| 7/20/2009 | $ 50.00 | Transfer - Acct. 1233800 |
| 9/30/2009 | $ 100.00 | Transfer - Acct. 1233800 |
| 2/22/2010 | $ 5,800.00 | Transfer - Acct. 1233800 |
| 2/23/2010 | $(4,800.00) | Transfer - Acct. 1233800 (credit) |
| 5/11/2010 | $ 500.00 | Transfer - Acct. 1233800 |

[4] *See* Def. Ex. 1, page 2.

| | | |
|---|---|---|
| 5/11/2010 | $ 1,000.00 | Transfer - Acct. 1233800 |
| 5/17/2010 | $ 1,000.00 | Transfer - Acct. 1233800 |
| 5/24/2010 | $ 1,000.00 | Withdrawal - cash |
| 5/26/2010 | $   500.00 | Transfer - Acct. 1233800 |
| 6/8/2010 | $ 2,000.00 | Transfer - Acct. 1233800 |

**Total Amount Not Returned    $30,529.81**

6.    However, the court considers irrelevant any "loans" or "gifts" made ***after*** the Petition

Date in Bankruptcy Case No. 2—as to the question of dischargeability in this Adversary

Proceeding.  While the Mother-in-Law is seeking repayment of ***all*** of these amounts in her state

court lawsuit, any monies that the Former Son-in-Law and the Daughter received ***after*** the April

30, 2008 Petition Date (whether gifts or loans) could not have been discharged, as a matter of

law, in Bankruptcy Case No. 2, and, thus, this court does not believe it can or should exercise

subject matter jurisdiction with regard to any of the disputes involving these monies.  Thus, this

court presents its own table, that reduces the 27 line items set forth above, down to 9 line items

that are relevant in this nondischargeability suit (hereinafter these will be referred to as the

"Prepetition Payments"):

| Date | Amount | Description |
|---|---|---|
| 8/3/2007 | $   508.70 | Cell Phone bill - paid by phone |
| 8/7/2007 | $ 2,000.00 | Check #1001 |
| 8/23/2007 | $ 2,500.00 | Check #1009 |
| 9/28/2007 | $ 3,000.00 | Check #1031 |
| 11/20/2007 | $ 1,000.00 | Transfer - Acct. 1233800 |
| 12/20/2007 | $   250.00 | Check #1076 |
| 3/21/2008 | $ 1,100.00 | Withdrawal - cash |
| 4/18/2008 | $ 1,000.00 | Withdrawal - cash |
| 4/11/2008 | $ 6,000.00 | Transfer - Acct. 1233800 |

**Total Amount Not Returned    $17,358.70**

7.    The testimony at Trial elaborated upon the Prepetition Payments set forth above.  The

Mother-in-Law credibly testified that her husband died on July 29, 2007, and she received

certain death benefits totaling around $69,000, which she deposited into an account at Resource

One Credit Union (the "Resource One Account" or the "Account").  The Mother-in-Law has two daughters, and both of them, as well as the Former Son-in-Law, were established as joint account holders on the Resource One Account and had access to it, although apparently they all considered it to be the Mother-in-Law's account.  The Former Son-in-Law and the Daughter were having financial distress around this same time, and funds from the Resource One Account started immediately being transferred to them as early as August 3, 2007.  On the first occasion (August 3, 2007), the Mother-in-Law testified that she actually paid a cell phone bill on which they all had phones (the phone bill was not put into evidence and it is unclear what portion of the bill might have been allocable to the Mother-in-Law versus the Daughter and Former Son-in-Law).  Additionally, on four occasions, checks were written off of the Account.  The first check (August 7, 2007), was made payable to the Former Son-in-Law, signed by the Mother-in-Law ($2,000), with nothing written on the memo line.[5]  The second check (August 23, 2007), was made payable to the Former Son-in-Law, signed by the Mother-in-Law ($2,500), with nothing written on the memo line.[6]  The third check (September 28, 2007), was made payable to the Former Son-in-Law, signed by *the Daughter* ($3,000), and "Loan" was handwritten on the memo line.[7]  The court notes that this check, unlike the others, has *both the Mother-in-Law's and Daughter's names shown on the upper left corner of the check as the account holders* (instead of merely the Mother-in-Law, like the other checks).  The fourth check (December 20, 2007), was made payable *to the Daughter by the Daughter*, with nothing written on the memo

---

[5] *See* Def. Ex. 2 (page 4).  Note that the check is actually dated August 4, 2007, but the date for it on Def. Ex. 1 (page 2) shows August 7, 2007—presumably the date the check was honored or cleared.

[6] *See* Def. Ex. 2 (page 5).  Note that the check is actually dated August 22, 2007, but the date for it on Def. Ex. 1 (page 2) shows August 23, 2007—presumably the date the check was honored or cleared.

[7] *See* Def. Ex. 2 (page 6).  Note that the check is actually dated September 26, 2007, but the date for it on Def. Ex. 1 (page 2) shows September 28, 2007—presumably the date the check was honored or cleared.

line.[8]  Finally, four of the Prepetition Payments (on November 20, 2007 ($1,000); March 21,

2008 ($1,100); April 11, 2008 ($6,000) and April 18, 2008 ($1,000)) were effectuated with either

transfers to other accounts or cash withdrawals, but there was no evidence at all revealing what

the underlying circumstances were for these Prepetition Payments.[9]

     8.  It is undisputed that all of the monthly account statements for the Resource One

Account show **both the Mother-in-Law and Daughter** as the Account holders, and show the

Mother-in-Law's address for where monthly accounts statements are sent.[10]

     9.  It is undisputed that there were never any promissory notes executed and no

conditions for repayment established with regard to the Prepetition Payments.  The Mother-in-

Law never demanded repayment from the Former Son-in-Law until after the Daughter and the

Son-in-Law divorced (their divorce was final in *December 2012*; the Mother-in-Law first

demanded payment from the Former Son-in-Law in *January 2013* and filed suit against him in

May 2013).  The Mother-in-Law has never sued or demanded payment from the Daughter.

While the Mother-in-Law takes the position now that the Prepetition Payments were loans,

certain of her testimony was less than convincing on this point.  When asked whether the payoff

of the cell phone bill on August 3, 2007 was a gift or a loan, she testified, "I guess you could take

it either way."  When asked by her attorney if she felt like her Former Son-in-Law had "picked

her pocket," she testified "sort of."  On the other hand, she did testify that the Former Son-in-

Law would ask to "borrow" money, and every time he would say he would "pay her back."  The

Former Son-in-Law did not deny that he may have used the word "borrow."  The one and only

---

[8] *See* Def. Ex. 2 (page 7).  Note that the check is actually dated December 18, 2007, but the date for it on Def. Ex. 1 (page 2) shows December 20, 2007—presumably the date the check was honored or cleared.

[9] *See* Def. Ex. 1 (page 2).  See also Def. Ex. 4 (Resource One Account statements, that do not shed any particular light on these transfers and withdrawals).

[10] *See* Def. Ex. 4.

thing that rang clear in the collective testimony was that there was complete informality and no agreements of any sort as to an obligation to repay or when.

10. It is undisputed that the Mother-in-Law was not scheduled as a creditor in Bankruptcy Case No. 2, was not on the mailing matrix, was not provided formal, written notice of it, and was not mentioned in any way during the bankruptcy case.[11] The court takes judicial notice that the Mother-in-Law was not scheduled as a creditor in the short-lived Bankruptcy Case No. 3 either and was not on the mailing matrix.[12] The court takes judicial notice that, in the short-lived Bankruptcy Case No. 3, unlike in Bankruptcy Case No. 2, the following entry appears on Schedule B, Question #2, where debtors are required to disclose bank accounts: ***"Mothers savings account. Signer only upon death of mother. Has not [sic] knowledge of the actual account history."*** Value listed as $0.[13] This appears, to this court, to have been a disingenuous description of the Resource One Account—since the Daughter actually had the authority to sign checks on it and, indeed, had signed checks on it (two such checks were in evidence).[14] But Bankruptcy Case No. 3 never lasted long enough for a Section 341 Meeting or other opportunity for this to be further explored. Finally, the court takes judicial notice that the Killingworths apparently do or did in the past transact a lot of business with Resource One. Their Schedules in Bankruptcy Case No. 2 showed a bank account there, two CDs that were at Resource One "for son," and two secured car loans.[15]

---

[11] *See* Pl. Ex. 1.

[12] *See* "Doc. No. 1" in the docket maintained by the Bankruptcy Court Clerk in Bankruptcy Case # 10-33136 (Bankruptcy Case No. 3).

[13] *See* "Doc. No. 1" in the docket maintained by the Bankruptcy Court Clerk in Bankruptcy Case # 10-33136 (Bankruptcy Case No. 3) (Schedule B).

[14] *See* Def. Ex. 2 (pages 6 & 7).

[15] *See* Pl. Ex. 1 (Schedule B, Question 2; Schedule D, page 2).

11.  The Mother-in-Law testified that she never had actual knowledge of Bankruptcy Case No. 2.  However, she testified that she did know about the later Bankruptcy Case No. 3.  There was nothing in the evidence that would credibly explain why she knew about one case, but not the other.

12.  The parties agree that the Mother-in-Law was not listed or discussed as a creditor in the Former Son-in-Law and Daughter's divorce case (not in the division of debts and not anywhere else).[16]  The Daughter testified that she exchanged emails or texts with the Former Son-in-Law and his attorney trying to get them to add the Mother-in-Law as a creditor (*i.e.,* as having an indebtedness of the marriage), but they refused.  However, there was no evidence presented of this except the Daughter's testimony—which the Former Son-in-Law disputed in his own testimony; the Daughter testified that she "did not know she could bring it up" (*i.e.,* these emails and texts to the Trial).

13.  As for the omission of the Mother-in-Law from the Killingsworths' bankruptcy schedules, the Former Son-in-Law testified that the Mother-in-Law had been intentionally omitted, but not fraudulently omitted; specifically, he had not ever considered her to be a creditor but, rather, these were gifts of a family member.  It was undisputed that the Daughter lost several jobs and was not working at the time of the various Prepetition Payments.  The Former Son-in-Law testified—credibly in this court's view—that these Prepetition Payments were forms of support by the Mother-in-Law for her Daughter and Former Son-in-Law.  The Former Son-in-Law testified credibly, in this court's view, that certain checks were made payable to him, not the Daughter, because he would deposit them at their bank located in Mesquite, which was convenient for him because he worked in Mesquite as a police officer.  The Daughter testified

---

[16] *See* Pl. Ex. 2C (starting page 6).

somewhat inconsistently. She first testified that she had no knowledge about the Prepetition Payments at the time they were made—that she heard conversations, but was "not ever allowed to discuss money." Later, the Daughter testified on cross-examination that she knew about the Former Son-in-Law "asking for loans" but she did not know the amounts every time. She also, at one point, stated that she did not know she had "access" to her mother's account. But as earlier mentioned, it is undisputed that she wrote two of the checks (one for $3,000 and one for $250).[17] The Mother-in-Law testified that the Former Son-in-Law stated that he did not want the Daughter to know about the Prepetition Payments. The Daughter testified that she considered her mother to be a creditor, but that her husband was very controlling of the family finances and bankruptcy paperwork, she was scared of him and his temper and controlling nature, and that she essentially acquiesced in how the Bankruptcy Schedules were presented. The Daughter testified that the Former Son-in-Law berated her for not having a job, when she wanted to put her Mother down on the bankruptcy schedules, and said that they needed to keep borrowing from the Mother-in-Law, so he did not want to put her down as a creditor or notify the Mother-in-Law of the bankruptcy. The Son-in-Law testified that there was never any discussion of listing the Mother-in-Law on the bankruptcy schedules, simply because they did not think of her as a creditor. Overall, the court found the Former Son-in-Law more credible on these contradictory points.

14. The Mother-in-Law testified that she had no knowledge of the bankruptcy case until after she filed the state court lawsuit in the year 2013 (and she learned during a deposition). This contradicts the slightly more credible testimony of the Former Son-in-Law, who stated that he was certain that there had been discussion of Bankruptcy Case No. 2 at her house and theirs.

---

[17] *See* Def. Ex. 2 (pages 6 & 7).

15.  There was, in all candor, a dearth of enlightening evidence at the Trial.  As stated early on, this was mostly a "he said; she said" with little documentary evidence.  A situation like this is not good for one—especially a family member—wanting to establish a "debt."

16.  In any event, the court found the Former Son-in-Law to be overall more credible than the Daughter and Mother-in-Law.  The overall facts and circumstances point to a situation in which the Mother-in-Law was generous (to a fault) with her money, and in her desire to help her Daughter and Former Son-in-Law with their chronic financial woes, but regretted this later when the couple were divorced.  Understandably so.  But the court, regrettably, believes that the Daughter and Mother-in-Law essentially massaged the facts—years later after the divorce was final.  The dearth of evidence and testimony leads to the inescapable conclusion that: (a) all of the relevant parties (*i.e.,* the Mother-in-Law, the Daughter, the Son-in-Law) were on the Resource One Account and had access to the funds in it (even though it was the Mother-in-Law who had deposited funds into it); (b) the Mother-in-Law ***readily*** allowed the Former Son-in-Law and Daughter to utilize the funds for their frequent financial needs; (c) nothing was ever put into writing, as to the funds the Former Son-in-Law and Daughter took; (d) there was not even an oral agreement or meeting-of-the-minds, about any obligation to repay the Mother-in-Law; (e) the Former Son-in-Law and Daughter intentionally left the Mother-in-Law off of the bankruptcy schedules—not because of any fraudulent intent, but simply because they did not regard her as a creditor (and both the Daughter and Former Son-in-Law bear equal responsibility for that decision); and (f) the court does not believe the Mother-in-Law had no actual knowledge of Bankruptcy Case No. 2—it strains credulity, given that she testified that she knew about one or more of the couple's ***other*** bankruptcy cases, and given her intimate knowledge of the financial stress in which her Daughter and Former Son-in-Law were so often embroiled.

## CONCLUSIONS OF LAW

### A. The Prepetition Payments Were Gifts, Not Loans.

Ordinarily, the court would consider the starting place, in determining whether a creditor's claim survived the Killingworths' Bankruptcy Case No. 2,[18] to be section 523(a)(3)(B) of the Bankruptcy Code, which provides that a "discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (3) neither listed nor scheduled under section 521(1) of this title . . . , in time to permit . . . (B) if such debt is a kind specified in paragraph (2), (4) or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability . . . unless such creditor had notice or actual knowledge of the case in time for such filing and request."  Thus, the court would typically explore: (a) whether the Mother-in-Law was listed or scheduled in the bankruptcy case  (here, the answer being "no"); (b) whether there was written notice to her (here, the answer being "no"); (c) whether, alternatively, there was actual knowledge (or constructive notice) of the bankruptcy, in time for the Mother-in-Law to take action in the chapter 7 case; and (d) whether the Mother-in-Law had the type of claim referred to in section 523(a)(2), (4) or (6) of the Bankruptcy Code, so that she might have requested a determination of nondischargeability as to her claims in the chapter 7 case. Here, the Killingworths' Bankruptcy Case No. 2 was a "no asset" case, with no distributions to unsecured creditors; thus, the issue of the Mother-in-Law's ability to timely file a proof of claim would be irrelevant.

---

[18] To be clear, the Killingworths' Bankruptcy Case No. 3 is irrelevant because it was extremely short-lived and there was never a discharge or any meaningful activity beyond the filing of Bankruptcy Schedules.  To further be clear, the Killingworths' Bankruptcy Case No. 1 is irrelevant because it pre-dated, by many years, the Prepetition Payments.

But here, the court has a preliminary question to answer:  Whether the Prepetition Payments were even loans, so that the Mother-in-Law was even a creditor.  Looking to relevant Texas state law,[19] the funds transferred appear to be more in the nature of gifts, not loans.

           1.   <u>Texas Law Regarding Gifts.</u>

First, looking at the law regarding gifts, to constitute a gift there must be a ***delivery*** of possession of the subject matter of the gift by the donor to the donee, coupled with a ***purpose*** on the part of the donor to vest in the donee, unconditionally and immediately, ownership of the property delivered (sometimes this is referred to as a ***donative intent***).[20]  A gift is a voluntary transfer of property to another made gratuitously and without consideration.[21]  As a general rule, the burden of proving a gift *inter vivos* is upon the party claiming that the gift was made. However, the burden of proof works differently when transfers are among family members. Specifically, there is a presumption that a parent intends to make a gift to his child, if the parent delivers possession, conveys title, or purchases property in the name of a child.[22]  In *Bogart v. Somer*, the Texas Supreme Court overruled a motion for rehearing on a denial of application for writ of error and, in doing so, approved of the holding of the court of appeals that:  (A) a presumption of gift exists when a father- and mother-in-law place property in their son-in-law's name; and (B) the party seeking to disprove the presumption must prove lack of donative intent by clear and convincing evidence.[23]

---

[19] *See Butner v. United States*, 440 U.S. 48, 55 (1979) (holding that state law governs the extent of property interests in bankruptcy).

[20] *Woodworth v. Cortez*, 660 S.W.2d 561, 563  (Tex. App.—San Antonio 1983, writ ref'd n.r.e).

[21] *Id.*

[22] *Id.* at 564.

[23] *Bogart v. Somer,* 762 S.W.2d 577, 577 (Tex. 1988) (per curiam).  *See also Richardson v. Laney,* 911 S.W. 2d 489, 492-93 (Tex. App.—Texarkana, 1995) (likewise holding that "[w]hen real property is deeded from

Thus, under Texas state law, the burden of proof, for establishing a gift, would ordinarily fall on the one claiming that a gift was made *(i.e.,* here, the Former Son-in-Law).  However, since the alleged donor was a family member (his then mother-in-law) a presumption exists in the law that the transfers of funds were gifts—*i.e.,* were made with donative intent.  Thus, the burden then shifts to the party seeking to disprove that they were gifts (*i.e.,* the Former Mother-in-Law) and she must prove **lack** of donative intent by clear and convincing evidence.

Quite simply, the Former Mother-in-Law here did not meet this clear and convincing standard with her evidence.  It is undisputed that the Former Mother-in-Law was a voluntary participant in all of the Prepetition Payments (regardless of the form they took—paying a bill, writing a check, the Daughter writing a check, or transfer or withdrawal of funds).  She put both the Daughter and the Former Son-in-Law on the Account from which the Prepetition Payments flowed as joint account holders.  They **all** had access and control over the Account.  The Former Mother-in-Law's voluntary participation in each of the Prepetition Payments was the equivalent of conveying possession each time.  The only evidence that the Prepetition Payments were not gifts among family was the Former Mother-in-Law's and the Daughter's testimony at Trial, and the circumstance that the Prepetition Payments were made *ad hoc* as needs arose—as opposed to at holidays or birthdays.[24]  But this testimony was not only self-serving and generally contradictory to the Former Son-in-Law's, but it is inconveniently juxtaposed against:  (a) years

---

parent to child or children, it is presumed that gift is intended"; presumption is rebuttable, but person seeking to rebut presumption must prove lack of donative intent by clear and convincing evidence; in this case, the presumption that a father had gifted real property to son and daughter was rebutted, where father had continued to live in property until his death, there was evidence that he wanted to put the home in children's name to avoid losing Medicare benefits, and deed was not recorded until after father's death).

[24] The court acknowledges that one of the Prepetition Payments, a $3,000 check signed by the Daughter to the Former Son-in-Law, had "Loan" handwritten on the memo line.  *See* Def. Ex. 2 (pg. 6).  However, not only was this the only time that such notation was use, but it is unclear who wrote it and when, and it, again, would appear to be a check negotiated between wife and husband.  This evidence raised more questions than answers.

of silence on the part of the Former Mother-in-Law, regarding any expectation of repayment; and (b) a demand for repayment from the Mother-in-Law only after the Daughter and Son-in-Law's divorce had just become final. A gift is a voluntary transfer of property to another made gratuitously and without consideration. This was not a situation of a Former-Son-in-Law sneaking his hand into the metaphorical cookie jar when the Mother-in-Law and Daughter were not looking. All eyes were wide open. Again, the Former Mother-in-Law was a voluntary participant in all of the transfers. The Former Mother-in-Law has failed to rebut the presumption of donative intent by clear and convincing evidence.

### 2. Texas Law Regarding Loans.

Next, looking at the black letter law regarding loans, a loan has been defined as "a contract by which one party agrees to let another party have the use of a specific sum of money for a definite or determinable period of time in consideration of a promise by the borrower to repay the amount borrowed, with or without interest."[25] In a contract for the loan of money, the material terms will generally be the amount to be loaned, maturity date of the loan, interest rate, and repayment terms.[26]

In short, in interpreting whether there is a loan (or what the terms of a loan may be) one looks to the law of contracts. And the "elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and, in the case of a written contract, (5) execution and delivery of the contract with the intent that it be mutual and binding."[27] Moreover, "[t]he primary and essential element of an express or implied contract is

---

[25] *See* PLAINTIFF'S PROOF OF A PRIMA FACIE CASE, PPPFC § 18.3 (Apr. 2014) (and citations therein).

[26] *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

[27] *Baroid Equip., Inc. v. Odeco Drilling, Inc.,* 184 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

the meeting of the minds of the parties by an offer and acceptance."[28]  A contract, in many

instances, can be either express or implied,[29] but its very existence may be determined by asking

whether there has been a meeting of the minds between the allegedly contracting parties.  In

discerning whether there is a meeting of minds, courts tend to look at the history and dealings of

the parties, and the determination of whether there was a meeting of the minds must be based on

objective standards of what the parties said and did and not on their alleged subjective states of

minds.[30]

In addition to the significance of the "meeting of the minds" factor, it has been

emphasized in case law that "[i]n order to be legally binding, a contract must be sufficiently

definite in its terms so that a court can understand what the promisor undertook."[31]  "The

material terms of the contract must be agreed upon before a court can enforce the contract.

---

[28] *Farley v. Clark Equip. Co.*, 484 S.W.2d 142, 147 (Tex. Civ. App.—Amarillo 1972, writ ref'd n.r.e.) (citing *Dunn v. Price*, 87 Tex. 318 (1894)).

[29] To be clear, some contracts must be in writing to be enforceable.  *See* TEX. BUS. & COMM. CODE § 26.01(b) (West 2005), the so-called "statute of frauds" in Texas, setting forth the types of contracts that must be signed and in writing to be enforceable.  None of the types of contracts set forth in Section 26.01(b) seem applicable in the case at bar  (the only type of contracts in Section 26.01's laundry list that might, at first blush, seem applicable are "agreements not performable within one year," but here, if there were indeed loans, the dates by which repayments  were required are not at all determinable; the dates could conceivably be longer than one year, but that is not the test; the test is "whether an agreement is capable of being performed within one year").  *Wilhoite v. Sims*, 401 S.W.3d 752, 758-759 (Tex. App.—Dallas 2013, no pet.) (a "contract that could possibly be performed within a year, however improbable performance within one year may be, does not fall within the statute of frauds") (*see also* citations quoted in *Wilhoite*).  *See also* TEX. BUS. & COMM. CODE § 26.02, that also provides that certain loan agreements in excess of $50,000 must also be in writing.  Once again, this would not be applicable in the case at bar, since all transfers of money (separately and in the aggregate) were less than $50,000.

[30] *See Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 715 (Tex. App.—Houston [1st Dist.] 1989, writ denied); *Slade v. Phelps*, 446 S.W.2d 931, 933 (Tex. Civ. App.—Tyler 1969, no writ).  *See also* WILLISTON ON CONTRACTS, § 3.2 "Requisites of Informal Contract" (4th ed. 2014) (and citations therein) ("The test for enforceability of an agreement is: (1) whether both or all parties, with the capacity to contract, manifest objectively an intent to be bound by the agreement; (2) whether the essential terms of the agreement are sufficiently definite to be enforced; (3) whether there is consideration; and (4) whether the subject matter of the agreement and its performance are lawful.").

[31] *T.O. Stanley Boot Co.,* 847 S.W.2d at 221 (and citations therein).

Where an essential term is open for future negotiation, there is no binding contract."[32] And, most particularly, with a contract to loan money, "the material terms will generally be: the amount of the loan, the maturity date of the loan, the interest rate, and the repayment terms."[33]

In summary, the court has no evidence here to conclude that there was a contract to loan money. There was quite clearly no meeting of the minds between the Chapter 7 Debtor and his Former Mother-in-Law. The Former Son-in-Law and the Daughter simply held out their hands for money (frequently), and the Former Mother-in-Law was quick to respond in their times of need. Moreover, any alleged contract to loan would have to fail for indefiniteness. Essential terms (*i.e.,* maturity date, interest rate, repayment terms) were wholly missing. These would all be material terms. Where essential and material terms are open for future negotiation, there is no binding contract.[34]

### B. Even if the Prepetition Payments Created Indebtedness Owing to the Mother-in-Law, the Court Concludes, Based on the Credibility of the Testimony, that She, in Fact, Had Actual Knowledge of the Bankruptcy Case.

Even if the Prepetition Payments ***did*** create indebtedness that the Killingsworths owed to the Mother-in-Law, this court still cannot conclude that such debt was excepted from the Killingsworths' discharge that they obtained in their Bankruptcy Case #2. As mentioned earlier, ordinarily, the court would consider the starting placing, in determining whether a creditor's claim survived the Killingworths' Bankruptcy Case No. 2, to be section 523(a)(3)(B) of the Bankruptcy

---

[32] *Id.* (and citations therein).

[33] *Id.* (and citations therein).

[34] *Id.* (and citations therein). *See also Pine v. Gibraltar Sav. Ass'n,* 519 S.W.2d 238, 244 (Tex. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) ("[w]here an agreement leaves material matters open for future adjustment and agreement, 'It is settled law that such a contract is not binding upon the parties to it and therefore is cannot be enforced.'") (and citations therein).

Code, which provides that a "discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (3) neither listed nor scheduled under section 521(1) of this title . . . , in time to permit . . . (B) if such debt is a kind specified in paragraph (2), (4) or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability . . . unless such creditor had notice or actual knowledge of the case in time for such filing and request." Thus, the court would explore: (a) was the Mother-in-Law listed or scheduled in the bankruptcy case (here, the answer being "no"); (b) was there written notice to her (here, the answer being "no"); (c) whether, alternatively, there was actual knowledge (or constructive notice) of the bankruptcy, in time for the Mother-in-Law to take action in the chapter 7 case; and (d) whether the Mother-in-Law had the type of claim referred to in section 523(a)(2), (4) or (6), so that she might have requested a determination of nondischargeability as to her claims in the chapter 7 case. As mentioned earlier, here, the Killingworths' Bankruptcy Case No. 2 was a "no asset" case, with no distributions to unsecured creditors; thus, the issue of the Mother-in-Law's ability to timely file a proof of claim is irrelevant. The Mother-in-Law and Daughter suggested that Bankruptcy Case #2 should not be considered a "no asset" case, because the Former Son-in-Law had nonexempt guns that *he* (really, ***they***) did not schedule. The Former Son-in-Law balked at this in testimony at Trial, and stated that the only weaponry he did not schedule would have been his duty weapons and gear issued by his employer, the Mesquite Police Department. In any event, the case was designated as a "no asset case" by the Bankruptcy Trustee, and this court has no credible evidence before it to treat Bankruptcy Case #2 as anything other than a "no asset case" where filing a proof of claim would have been of no consequence to any creditor.

Thus, the issue here is whether the Former Mother-in-Law had actual knowledge (or constructive notice) of the bankruptcy, in time to request a determination of nondischargeability

as to her claims in the chapter 7 case—assuming she had those type of claims referred to in section 523(a)(2), (4) or (6) of the Bankruptcy Code.

In a chapter 7 bankruptcy case, a "creditor has sufficient notice of bankruptcy proceedings even if there is no formal notice given of the filing deadlines, if he receives notice in time to act prior to the filing deadlines."[35] "Where a creditor receives any notice that its debtor has initiated bankruptcy proceedings, it is under constructive or inquiry notice that its claim may be affected, and ignores the proceedings to which the notice refers at its peril."[36] In *In re Sam*, the Fifth Circuit further indicated that "[w]hen a creditor is aware of the pendency of bankruptcy proceedings, the imposition of a duty on the part of the creditor to make an inquiry to determine the date of the first meeting of creditors, and to consult Bankruptcy Rule 4007(c) and calculate the bar date (sixty days after the date set for the initial creditors' meeting) is not so burdensome as to outweigh the need for expeditious administration of bankruptcy cases."[37] "The statutory language of [section 523(a)(3)(B)] clearly contemplates that mere knowledge of a pending bankruptcy proceeding is sufficient to bar the claim of a creditor who took no action, whether or not the creditor received official notice from the court of various pertinent dates."[38]

While it is undisputed that the Former Mother-in-Law was not scheduled as a creditor and did not receive formal notices regarding the Killingsworths' Bankruptcy Case No. 2, this court believes from the testimony at Trial that the Mother-in-Law *did,* indeed, have *actual* knowledge of her Daughter and Former Son-in-Law's Bankruptcy Case No. 2, and was able to

---

[35] *Doucette v. Pannell (In re Pannell)*, 136 B.R. 430, 434 (N.D. Tex. 1992).

[36] *Grossie v. Sam (In re Sam)*, 94 B.R. 893, 897 (Bankr. W.D. La. 1998), *aff'd*, 894 F.2d 778 (5th Cir. 1990).

[37] *Id*. at 781.

[38] *Byrd v. Alton (In re Alton)*, 837 F.2d 457, 460 (11th Cir. 1988) (cited with favor by *Ramos v. Compton (In re Compton)*, 891 F.2d 1180, 1184 (5th Cir. 1990)).

be proactive and protect her rights therein. While the Mother-in-Law testified that she never knew of Bankruptcy Case No. 2 until a deposition in state court in 2013, the court did not find this testimony wholly credible—especially considering that she testified that she **did** know about the **other** bankruptcy cases the Killingworths filed, and she also seemed to have intimate knowledge of their ongoing financial stress. On the other hand, the Former Son-in-Law consistently and credibly testified that he was "certain" the Mother-in-Law had been told they filed Bankruptcy Case No. 2–stating that there had been multiple discussions at her house and theirs. While this boils down to a "he said; she said," the court simply found the Son-in-Law to be slightly more credible on this point. Accordingly, the court finds that, even if there was legal indebtedness owing to the Mother-in-Law, she had actual knowledge of Bankruptcy Case No. 2, so as to assert/protect her rights therein.

**C. Even if the Prepetition Payments Created Indebtedness Owing to the Mother-in-Law, and Even if She Had No Actual Knowledge of the Bankruptcy Case, the Court Concludes that She Did Not Meet Her Burden of Proof of Establishing a Section 523(a)(2), (a)(4), or (a)(6) Debt.**

Finally, assuming that some sort of legal indebtedness **was** created *vis-a-vis* the Mother-in-Law, and even if she did **not**, in fact, have actual knowledge of Bankruptcy Case No. 2, the court still could not conclude that the Prepetition Payments constituted the type of ***debts specified in paragraph (2), (4), or (6) of section 523 of the Bankruptcy Code***. As mentioned earlier, here, since the Killingsworths' Bankruptcy Case No. 2 was a "no asset case" with no distributions to unsecured creditors, the issue of the Mother-in-Law's ability to file a proof of claim is irrelevant.

The standard of proof for a plaintiff in an action under section 523(a) is preponderance of the evidence.[39] Exceptions to discharge are construed in favor of the debtor with a view to the policy that the Bankruptcy Code provides a fresh start to debtors.[40]

Here, it has been alleged that the Prepetition Payments were nondischargeable pursuant to section 523(a)(2) of the Bankruptcy Code, since the Former Son-in-Law assured the Mother-in-Law and Daughter that he would repay the Mother-in-Law and he did not. It is also alleged that the Former Son-in-Law essentially stole money from the Mother-in-Law "by trick, by fraud and deceit."[41] He allegedly represented that he would repay the monies and he never intended to. It was further suggested that the omission of the Mother-in-Law from the Schedules and Mailing Matrix in Bankruptcy Case No. 2 was further fraud. Finally, there was an undertone throughout the testimony of the Former Mother-in-Law and Daughter at Trial that the Former Son-in-Law emotionally and physically intimidated them both (as he was a policeman trained in "violence") and they were victims of his domineering ways.

1.  Section 523(a)(2)(A) Does Not Apply.

Section 523(a)(2)(A) of the Bankruptcy Code provides that "[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[42]

---

[39] *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995).

[40] *McCoun v. Rea (In re Rea)*, 245 B.R. 77, 84-85 (Bankr. N.D. Tex. 2000).

[41] Joint Pretrial Order, p. 6.

[42] 11 U.S.C. § 523(a)(2)(A).

In order to prove that, pursuant to section 523(a)(2)(A), a debt is nondischargeable as obtained through fraud, the creditor must show (1) that the debtor made representations other than a statement concerning his financial condition, (2) that at the time the debtor made the representations he or she knew they were false, (3) that the debtor made the representations with the intention and purpose to deceive the creditor, (4) that the creditor justifiably relied on such representations, and (5) that the creditor sustained losses as a proximate result of the false representations.[43] False representations need not be overt. "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation."[44] Misrepresentations may also be made through conduct.[45] However, "[d]ebts falling within the ambit of section 523(a)(2)(A) are those obtained by fraud 'involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made.'"[46] Intent to deceive may be inferred from "a reckless disregard for the truth or falsity of the statement."[47] "Intent of a kind sufficient to preclude discharge for debt for money obtained by debtor's false pretenses, false representation or actual fraud may be inferred where a debtor makes a false representation and knows or should know that the statement will induce another to act."[48]

---

[43] *Gen. Electric Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005); *RecoverEdge*, 44 F.3d. at 1293; *Rea*, 245 B.R. at 85; *Manheim Auto. Fin. Serv., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131 (Bankr. N.D. Tex. 2005).

[44] *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001).

[45] *Id.*

[46] *Provident Bank v. Merrick (In re Merrick)*, 347 B.R. 182, 186 (Bankr. M.D. La. 2006) (quoting *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992)).

[47] *Acosta*, 406 F.3d at 372.

[48] *Hurst*, 337 B.R. at 133.

In evaluating a cause of action under section 523(a)(2)(A), whether it is a question of false pretenses or false representation or actual fraud, the court must determine that the plaintiff justifiably relied upon the representations made by the defendant.[49] Justifiable reliance does not require independent investigation of the facts as presented, but a plaintiff may not blindly rely upon a misrepresentation, the falsity of which would be obvious to the plaintiff had he used his sense to make a cursory examination.[50] Justifiable reliance is not a "reasonable man" standard, but is a lesser standard than reasonable reliance (which is a statutory element of section 523(a)(2)(B)).[51]

Here, the court cannot conclude any indebtedness (if it were indebtedness) fit within section 523(a)(2)(A) of the Bankruptcy Code. It is ***always*** the case with debtors in bankruptcy that they had various borrowing arrangements with others; that they promised to pay them back; and they did not. Broken promises to repay are the stuff of all bankruptcies. And, as alluded to earlier, the evidence does not support a theory that the Former Son-in-Law essentially stole money from the Mother-in-Law "by trick, by fraud and deceit."[52] The Former Mother-in-Law was always a willing participant in allowing her money to be used to help her Daughter and Former Son-in-Law out. Moreover, the evidence does not suggest that the omission of the Mother-in-Law from the Schedules and Mailing Matrix in Bankruptcy Case No. 2 was tantamount to a fraud. The Fifth Circuit has indicated that courts must examine the circumstances surrounding the failure to list a creditor and "a court should not discharge a debt

---

[49] *Field v. Mans*, 516 U.S. 59, 61 (1995).

[50] *Id*. at 69-71.

[51] *Id*. at 72-73.

[52] Joint Pretrial Order, p. 6.

under section 523(a)(3) if the debtor's failure to schedule that debt was due to intentional design, fraud, or improper motive."[53]  On the other hand, if the "failure to list the debt was due to inadvertence or negligence," then "equity permits discharge of the debt."[54]  In this case, there is really a situation of "none of the above"—in other words, there was not only no "intentional design, fraud, or improper motive," but the omission was also not "due to inadvertence or negligence" either.  The court concludes, based on the testimony, that the Former Son-in-Law and Daughter both simply did not view the Prepetition Payments as debt that needed to be scheduled.  The omission was intentional, but not fraudulent.  The omission speaks to the very nature of the Prepetition Payments (*i.e.,* no one really considered them loans until after an unhappy divorce).  Last, as for the argument that the Former Son-in-Law had a domineering and controlling side to him, while unfortunate, if true, this does not constitute fraud under section 523(a)(2)(A).

### 2.  Sections 523(a)(4) and (6) Likewise Would Not Apply.

There is no need to belabor or address in depth the oft-analyzed sections 523(a)(4) and (6) of the Bankruptcy Code.  There was no "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" here.[55]  There was no "willful and malicious injury"[56] by the Former Son-in-Law to his Former Mother-in-Law or her property.  This was simply a situation of one family member helping other family members, followed by regret and ill feelings later.

---

[53] *Stone v. Caplan (In re Stone)*, 10 F.3d 285, 291 (5th Cir. 1994).

[54] *Am. Chiropractic Clinic-North Dallas PC v. Rodriguez*, No. 02-10970, 2003 WL 1098043, at *1 (5th Cir. Feb. 10, 2003).  *See generally Robinson v. Mann,* 339 F.2d 547, 550 (5th Cir. 1964).

[55] 11 U.S.C. § 523(a)(4).

[56] 11 U.S.C. § 523(a)(6).

## <u>CONCLUSION AND JUDGMENT</u>

For the foregoing reasons, the court grants **JUDGMENT** as follows:

1. The court declares that the Prepetition Payments constituted gifts, not indebtedness;

2. In order to protect this court's section 524 discharge injunction as to the Plaintiff, the Former Son-in-Law, the court hereby enjoins Defendant, the Former Mother-in-Law, from further attempting to collect repayment from the Plaintiff, the Former Son-in-Law, with regard to the Prepetition Payments, as there was no indebtedness created and, even if there were, any indebtedness was discharged in the above-referenced bankruptcy case;

3. No damages are appropriate or will be awarded;

4. All counterclaims of the Defendant, the Former Mother-in-Law, are denied; and

5. All parties shall bear their own attorneys' fees and costs.


**###END OF FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT###**